**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PENN MUTUAL LIFE INSURANCE, COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No.  17 C 3562 |
| | ) | |
| **JONATHON ROTTER, JONATHON CORTEEN, RUSSELL HARTIG, ALEKSANDER DABROWSKI, and AMERICAN UNITED LIFE INSURANCE CO.,** | ) ) ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Penn Mutual Life Insurance Company (hereafter "Plaintiff" or "Penn Mutual") has sued four of its former employees, along with their new employer, America United Life Insurance Company (hereafter "AUL or "America United"), alleging breach of contract and tortious interference with contractual relations.  According to Plaintiff, the Defendant-employees breached their employment contracts by enlisting, soliciting, or inducing other Penn Mutual agents and employees to alter their employment relationship with the company; by soliciting or servicing Penn Mutual policyholders for the purpose of inducing those policyholders to cancel, lapse, or fail to renew their policies; and by "interfering" with Penn Mutual's relationships with its customers.  The individual and corporate Defendants have filed two separate motions for judgment on the pleadings, arguing that the contractual provisions at issue are unenforceable under Pennsylvania law.  For the reasons explained below, these motions are granted in part and denied in part.

## BACKGROUND

Penn Mutual, a Pennsylvania corporation with its principal place of business in Pennsylvania, sells life insurance, annuities, and other investment products.  (Second Am.

Compl. [56], at ¶¶ 1, 10.)  All individual Defendants are citizens of Illinois and former employees of Penn Mutual.  (*Id.* at ¶¶ 2-6.)  Defendant America United Life Insurance Company (AUL) is incorporated in Indiana and has its principal place of business in Indianapolis.[1]

From April 2009 until May 2017, Defendants Jonathan Rotter and Jonathan Corteen were employed by Penn Mutual as Managing Partners of the company's field offices in Tinley Park, Illinois, and Detroit, Michigan.  (*Id.* at ¶ 11.)  Penn Mutual's Managing Partners are charged with recruiting, selecting, and mentoring Sales Managers for their field offices, among other tasks.  (*Id.* at ¶ 12.)  Those Sales Managers, in turn, "recruit and subsequently support" a network of "independent agents," who sell Penn Mutual's products to customers and "report into" a designated Penn Mutual field office.  (*Id.* at ¶¶ 10, 16.)  According to Penn Mutual, a "key component" of its business success "has been its ability to recruit, develop, and retain agents with large portfolios of policyholders and clients.  These agents serve as the primary point of contact between Penn Mutual and its policyholders and clients and develop a substantial amount of goodwill with the policyholders and clients."  (*Id.* at ¶ 15.)

At the request of Rotter and Corteen, Penn Mutual hired Defendants Russell Hartig and Aleksander Dabrowski to work as Sales Managers at the field offices Rotter and Corteen managed.  (*Id.* at ¶ 13.)  Hartig was hired as a Sales Manager on or around April 1, 2009.  (*Id.*)  Dabrowski was hired as a Sales Manager on or around August 1, 2014.  (*Id.*)[2]  Together, the four individual Defendants in this case recruited and supported approximately 100 independent agents.  (*Id.* at ¶ 14.)  These 100 agents "manage[d]" approximately 4,800 policies and contracts on behalf of Penn Mutual.  (*Id.*)

---

[1]     Plaintiff's Second Amended Complaint names OneAmerica Financial Partners, Inc., as a defendant, but this court previously ordered America United Life Insurance Company to be substituted for OneAmerica on the face of the pleadings.  (*See* Not. of Docket Entry, June 15, 2017 [33]; Transcript of Proceedings, June 15, 2017 [42], at 2:20-24, 4:17-5:1.)

[2]     On or around December 29, 2015, Hartig and Dabrowski each assumed the title of "Functional Sales Manager."  (*Id.*)  It is not clear from the record how the position of Functional Sales Manager differs from the position of Sales Manager.

When Rotter and Corteen began their employment with Penn Mutual on April 1, 2009, they entered into "Managing Partner Contracts" with the company, which became effective on that date. (*Id.* at ¶ 18.) Section 16 of these contracts is titled "Trade Secrets; Agreement Not to Interfere with Penn Mutual Policies or Policyholders." (Rotter Managing Partner Contract (hereafter "Rotter MPC") § 16, Ex. A to Second Am. Compl.; Corteen Managing Partner Contract (hereafter "Corteen MPC") § 16, Ex. B to Second Am. Compl.) Among other things, this section purports to prohibit certain conduct for a period of one year following the contract's termination. (*Id.* at § 16(b)(3).) Specifically, during that one-year period, Managing Partners agree to

> refrain from (a) further solicitation or servicing of policyholders of Penn Mutual or any other insurance company in the Penn Mutual holding company system for the purpose of inducing or attempting to induce such policyholders to cancel, lapse or fail to renew policyholders' policy and/or contract with Penn Mutual; (b) enlisting any representative of Penn Mutual to act in any capacity for another insurance company, association, or society, and (c) interfering in any way during such one-year period with existing policies and policyholders of Penn Mutual or of any other insurance company in the Penn Mutual holding company system.

(*Id.*) These Managing Partner Contracts also include severability clauses stating that "[i]f . . . any provision of the contract is held under applicable law to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective only to the extent of such invalidity and the validity, legality and enforceability of the remaining provisions of this contract shall not be affected or impaired in any way." (*Id.* at § 19.) Section 20 states that the contracts "shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania without regard to choice of law principles." (*Id.* at § 20.)

Defendants Dabrowski and Hartig entered into Functional Sales Manager's Contracts with Penn Mutual on December 29, 2015, and January 8, 2016, respectively. (Second Am. Compl. ¶ 20.) Section 14 of these contracts is largely similar to Section 16 of the Managing Partner Contracts; it has the same title ("Trade Secrets; Agreement Not to Interfere with Penn Mutual Policies or Policyholders"), as well as the same language that appears in subsections

16(b)(3)(a) and (c) above. (Hartig Functional Sales Manager's Contract (hereafter "Hartig FSMC") § 14(b)(3), Ex. C to Second Am. Compl.; Dabrowski Functional Sales Manager's Contract (hereafter "Dabrowski FSMC") § 14(b)(3), Ex. D to Second Am. Compl.) Instead of a prohibition on "enlisting" representatives of Penn Mutual, however, Section 14 purports to bar the Functional Sales Managers, for a period of 18 months following termination of their employment, from "solicit[ing] or otherwise induc[ing] any employ or agent of Penn Mutual, including those who were affiliated within 12 months prior to termination of [the Functional Sales Manager's] agreement with the company, to terminate or otherwise change her/his employment or affiliation with the Company to join any business that directly or indirectly competes with Penn Mutual." (*Id.* at § 14(b)(4).) These Functional Sales Manager's Contracts contain severability and choice-of-law provisions that are identical to those in the Managing Partner Contracts noted above. (*Id.* at §§ 16-17.)[3]

On April 28, 2017, Hartig's wife, Kamala Hartig, then an Office Manager at Penn Mutual's Chicago office, "directed" an unidentified Penn Mutual employee "to send, by overnight delivery, an iPad maintained in the Chicago field office to Rotter and Corteen." (*Id.* at ¶ 29.)[4] The employee "followed this directive and sent the iPad to Rotter and Corteen." (*Id.*) According to Penn Mutual, the iPad "was primarily used"—it is not clear by whom—"in connection with recruiting agents and included information on potential agents being recruited, as well as evaluations of current agents." (*Id.*)

---

<sup>3</sup> Unlike the Managing Partner Contracts, the Functional Sales Manager's Contracts also include a forum selection clause stating that "[i]n all cases where a party seeks relief in connection with this Agreement in a court of competent jurisdiction, the exclusive forum and venue shall be federal court of the Eastern District of the Commonwealth of Pennsylvania or the Common Pleas Court of Montgomery County, Pennsylvania." (Hartig FSMC § 17; Dabroskwi FSMC § 17.) Defendants have waived a defense premised on improper venue by failing to raise it in their motions for judgment on the pleadings. *See* FED. R. CIV. P. 12(h)(1).

<sup>4</sup> It is not clear from the record whether this iPad was owned by Penn Mutual, by Rotter or Corteen, or by someone else entirely.

At 8:16 a.m. on May 1, 2017, Defendants Rotter and Corteen simultaneously informed Penn Mutual of their resignations via e-mail. (Second Am. Compl. ¶ 22.) On May 4, 2017, Defendants Hartig and Dabrowski "announced their resignations from Penn Mutual effective immediately." (*Id.* at ¶ 23.) Also on May 4, Kamala Hartig resigned from her position as Office Manager at Penn Mutual's Chicago office. (*Id.*)[5]

Penn Mutual "subsequently learned"—it is not clear exactly when or how— that all four individual Defendants "informed Penn Mutual agents that they were joining [America United], a direct competitor of Penn Mutual in [the] field of life insurance, annuities, and investment products." (*Id.* at ¶ 24.) According to Penn Mutual, an unidentified Penn Mutual employee "has reported that she spoke with Corteen after his resignation, and he encouraged her to e-mail the [America United] website and that he would then tell her about potential new positions there." (*Id.* at ¶ 27.) An unidentified agent, Plaintiff continues, "has announced his intention to leave Penn Mutual to join Rotter, Corteen, Dabrowski, and Hartig at [America United]." (*Id.* at ¶ 28.) This same agent "also reported that he would be taking his business to [America United] and that Rotter and Corteen were trying to recruit people from Penn Mutual." (*Id.*) According to Penn Mutual, "at least six of Rotter's former Penn Mutual accounts have either lapsed or surrendered their life insurance policies" since Rotter left the company. (*Id.* at ¶ 31.) At least eight of Corteen's, five of Dabrowski's, and six of Hartig's "former Penn Mutual accounts" have done the same.[6] (*Id.* at ¶¶ 32-34.)

On May 5, 2017, Penn Mutual mailed nearly identical letters to all four individual Defendants, "remind[ing]" them "of their contractual obligations to Penn Mutual, including their obligations to not solicit Penn Mutuals' [sic] agents and employees." (*Id.* at ¶ 31; Letter of

---

[5]     Kamala Hartig is not named as a Defendant here, and Plaintiff does not allege that she ever entered into an employment agreement with Penn Mutual that contained post-employment restrictive covenants.

[6]     Penn Mutual does not identify the precise meaning of "account" in this context; the court presumes it refers to an individual whose life is insured by Penn Mutual.

May 5, 2017, Exs. G, H, I, J to Second Am. Compl.)  The letter also expressed concern that the individual Defendants were "presently using, or planning to use, [Penn Mutual's] confidential and trade secret information in a competitive and unlawful fashion."  (Letter of May 5, 2017.)  An attorney representing Rotter and Corteen apparently obtained a copy of this letter on the same day it was mailed, and e-mailed a response to Penn Mutual later that afternoon.  (E-mail of May 5, 2017, Ex. K to Second Am. Compl.)  This e-mail stated that Rotter and Corteen would return the only "Penn Mutual files" in their possession, which were "the files of their family members that they possessed when they each resigned."  (*Id.*)[7]  The e-mail also stated that Rotter and Corteen were "aware of the terms and conditions of the Managing Partner Contract that they executed."  (*Id.*)  The attorney's response, however, "did not confirm that [Rotter and Corteen] would abide by those terms and conditions."  (*Id.*)

Penn Mutual filed this lawsuit on May 11, 2017, asserting claims of breach of contract and tortious interference with contractual relations.  (Compl. [1].)  The company seeks injunctive relief and compensatory damages from all Defendants, as well as punitive damages from America United.[8]  The individual Defendants and America United filed separate answers [17, 23] to Plaintiff's First Amended Complaint [6], and then filed two separate motions for judgment on the pleadings [24, 27].  While these motions were pending before the court, Penn Mutual filed a Second Amended Complaint [56], which included additional allegations regarding the cancellation of certain Penn Mutual accounts following the individual Defendants' resignations. Defendants have notified the court [54, 55] that they will not seek leave to amend their motions in light of the Second Amended Complaint.

---

[7]      Penn Mutual has not alleged anything with regard to these files, and it is not clear from the record whether Rotter and Corteen did or did not return them.

[8]      On May 24, 2017, Penn Mutual withdrew by agreement its motion for a temporary restraining order and preliminary injunction.  (*See* Not. of Docket Entry, May 24, 2017 [20].)

**<u>DISCUSSION</u>**

Motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure are governed by "the same standard" as motions to dismiss under Rule 12(b)(6). *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). To survive either motion, a plaintiff's complaint must "state a claim that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court may consider exhibits attached to the complaint to determine whether this requirement is satisfied. *Segal v. Geisha NYC LLC*, 517 F.3d 501, 504-05 (7th Cir. 2008). Although the court must construe the complaint "in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the nonmoving party's] favor," *Berger v. Nat'l Coll. Athletic Ass'n*, 843 F.3d 285, 290 (7th Cir. 2016), it need not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court considers Defendants' motions with regard to Plaintiff's breach of contract and tortious interference claims in turn.

**I.  Breach of Contract**

Restrictive covenants in employment contracts "are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living." *Hess v. Gebhard & Co., Inc.*, 570 Pa. 148, 157, 808 A.2d 912, 917 (2002). To be enforceable under Pennsylvania law, such a covenant must be (1) "incident to an employment relationship between the parties"; (2) "reasonably necessary for the protection of the employer"; and (3) "reasonably limited in duration and geographic extent." *Id.* Where a restrictive covenant is broader than necessary to protect the employer's legitimate interests, Pennsylvania law permits the court to modify or partially enforce the agreement—provided its terms are severable and the restrictions are not so gratuitously overbroad as to "indicate[] an intent to oppress the employee and/or to foster a monopoly." *Sidco Paper Co. v. Aaron*, 465 Pa. 586, 599, 351 A.2d

7

250, 257 (1976); *see also Reading Aviation Service, Inc.*, 454 Pa. 488, 492-93, 311 A.2d 628, 630-31 (1973).

Penn Mutual claims that the four individual Defendants breached their respective contracts by (1) "soliciting or otherwise encouraging agents and/or employees of Penn Mutual to leave the service of Penn Mutual and join a competitor"; (2) "inducing Penn Mutual policyholders to lapse, fail to renew, or otherwise terminate their Penn Mutual policies"; and (3) "interfering with Penn Mutual's relationship with its customers." (Second Am. Compl. ¶¶ 42-43.) In their motion for judgment on the pleadings, Defendants argue that all of the potentially applicable restrictions in their contracts are facially overbroad, and thus unenforceable. (Ind. Defs.' Memorandum in Supp. of Mot. for J. on the Pleadings (hereafter "Ind. Defs.' Mot.") [28], at 2.)

### a.      Solicitation of former coworkers

The language relevant to the individual Defendants' alleged solicitation of Penn Mutual employees and agents is located in subsection 16(b)(3)(b) of the Managing Partner Contracts (MPC) and in subsection 14(b)(4) of the Functional Sales Manager's Contracts (FSMC). Rotter and Corteen agreed to refrain, for a period of 12 months following the termination of their employment, from "enlisting any representative of Penn Mutual to act in any capacity for another insurance company, association, or society." (Rotter MPC § 16(b)(3)(b); Corteen MPC § 16(b)(3)(b).) Hartig and Dabrowski agreed to refrain, for a period of 18 months following the termination their employment, from "solicit[ing] or otherwise induc[ing] any employ or agent of Penn Mutual, including those who were affiliated within 12 months prior to termination of [the Functional Sales Manager's] agreement with the company, to terminate or otherwise change her/his employment or affiliation with the Company to join any business that directly or indirectly competes with Penn Mutual." (Hartig FSMC § 14(b)(4); Dabrowski FSMC § 14(b)(4).)

Penn Mutual argues that these restrictions on the solicitation of Penn Mutual's workers are "reasonably necessary" to "preserve customer good will." (Pl.'s Resp. in Opp. to Ind. Defs.' Mot. (hereafter "Pl.'s Resp. to Ind. Defs.") [35], at 7.) Temporarily restricting former employees'

ability to solicit Penn Mutual workers is necessary to preserve customer good will, the company suggests, because those workers "serve as the primary point of contact between Penn Mutual and its policyholders and clients and develop a substantial amount of goodwill with the policyholders and clients." (Second Am. Compl. ¶ 15.) Defendants do not challenge Penn Mutual's claim to a legitimate interest in retaining workers who are the source of the company's customer good will.[9] Rather, Defendants argue that the employee non-solicitation provisions are overbroad, and are thus not "reasonably necessary" for the protection of this interest. (*See* Ind. Defs.' Mot. 8-9.)

Defendants offer several rationales for finding the employee non-solicitation provisions to be overbroad. First, they suggest that these provisions prohibit not only the *active* solicitation of Penn Mutual employees or agents, but also a wide array of *passive* conduct undertaken in response to unsolicited inquiries from such persons. (*Id.* at 7-8.) They analogize the provisions to those a court found to be unenforceable in *Diodato v. Wells Fargo Ins. Services, USA, Inc.*, 44 F. Supp. 3d 541 (M.D. Pa. 2014). The employment contract at issue in that case stated, among other things, that the plaintiff could not "directly or indirectly . . . [a]ccept insurance business from" certain customers of his former employer or any of his former employer's affiliates. *Id.* at 570. Such a "non-acceptance provision" is unenforceable under Pennsylvania law, the court explained, because it "goes well beyond prohibiting the active solicitation of clients and prohibits passive acceptance of *unsolicited* former clients who contact Diodato unilaterally." *Id.* at 570. The provision "purports to restrict the liberty of third parties who, of their own volition, unilaterally seek Diodato's services." *Id.* The court explicitly distinguished this overbroad restriction on the "passive acceptance" of unsolicited contact from two other

---

[9] Under Pennsylvania law, legitimate business interests that can justify the enforcement of a noncompetition agreement include (but are not limited to) the protection of "trade secrets, confidential information, good will, and unique and extraordinary skills." *Hess*, 570 Pa. at 163.

provisions in the agreement, which the court found to be "narrowly tailored" because they restricted only "active solicitation." 44 F. Supp. 3d at 569.

Defendants attribute great importance to the language in *Diodato* suggesting that the non-acceptance provision at issue was overbroad because it restricted both "active" and "passive" conduct. They note that section 16(b)(3)(b) of Rotter and Corteen's contracts refers to "enlisting" rather than "soliciting" their former coworkers. "The use of the word 'enlisting,'" Defendants suggest, "usually connotes someone seeking you out such as when someone enlists in the armed forces." Like the non-acceptance provision in *Diodato*, Defendants reason, the restriction on "enlisting" Penn Mutual workers "restricts the liberty of third parties, who on their own volition, reach out to Individual Defendants and seek to make a change." (*Id.* at 7-8.) According to Defendants, Penn Mutual's interest in preserving customer good will cannot justify "prohibiting [the individual Defendants] from having Penn's employees seek them out for advice on whether they should move to another employer." (*Id.* at 8.)

As an initial matter, this court disagrees with the individual Defendants' interpretation of their contracts. A restriction on "enlisting any representative of Penn Mutual to act in any capacity for another insurance company, association, or society" does not, in fact, bar the individual Defendants from offering "advice" in response to unsolicited inquiries from former coworkers. In Defendants' own example of how "enlist" is used in ordinary language, the word refers to the active conduct of a person joining the armed forces—not the passive conduct of the armed forces being joined. Dictionaries and thesauruses confirm that the verb "to enlist" connotes deliberate, affirmative conduct. It means not only "to *enroll oneself* in the armed forces," but also "to secure the support and aid of," or "to participate heartily (as in a cause, drive, or crusade)." *Enlist*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1997) (emphasis added). Synonyms of "enlist" include "engage," "call up," and "recruit." *Enlist*, WEBSTER'S NEW WORLD THESAURUS (Rev. ed. 1985). None of these meanings suggest the

mere "passive acceptance" of a third party's unsolicited inquiry that was at issue in *Diodato*. 44 F. Supp. 3d at 569.

Even if Defendants are right that the word "enlist" encompasses "passive" conduct as well as "active" conduct, this court doubts that a categorical distinction between "active" and "passive" conduct was as important to the decision in *Diodato* as Defendants seem to believe. The specific "passive" conduct at issue in that case—"accepting" unsolicited business *from customers* of the plaintiff's former employer and any of its affiliates—was critical to the plaintiff's trade. *Id.* at 570. The prohibition on his "acceptance" of this unsolicited business impeded his "ability to earn a living following his termination." *Id.* Defendants have offered no reason to believe that a restriction on their ability to "enlist" Penn Mutual's *agents and employees* to work for another employer—even if the verb "enlist" is defined broadly to include responding to an unsolicited inquiry—would similarly impede their ability to earn a living in their chosen field.

Defendants next argue that the non-solicitation provisions are overbroad because they prohibit solicitation on behalf of entities that are not direct competitors of Penn Mutual. This argument misunderstands the nature of Penn Mutual's interest in retaining its agents, employees, and representatives. If a valuable worker leaves Penn Mutual, the company suffers even if that worker does not join one of Penn Mutual's direct competitors. Penn Mutual might have a *stronger* interest in limiting the number of workers who leave to join a direct competitor, but this does not mean that the company lacks a legitimate interest in limiting worker attrition generally. This is particularly true where the workers develop close relationships, and thus significant good will, with the company's customers.

Finally, Defendants note that Hartig and Dabrowski's contracts temporarily restrict their ability to solicit certain *former* Penn Mutual workers, as well as those whom Penn Mutual currently employs. (*See* FSMC § 14(b)(4).) The limitation on Hartig and Dabrowski's ability to solicit persons who no longer work for Penn Mutual may indeed sweep more broadly than is necessary to protect the interests articulated by Penn Mutual. The court need not decide

whether it does in fact, however, because Penn Mutual has not alleged that Hartig or Dabrowski solicited an individual who had already ceased working for the company. Nor is the restriction—which limits only solicitation and inducement for a particular purpose, and does so for only 18 months—so gratuitously overbroad that it "indicates an intent to oppress the employee and/or to foster a monopoly." *Sidco*, 465 Pa. at 599, 351 A.2d at 257.

Pennsylvania law permits the enforcement of a covenant that temporarily restricts a former employee's ability to enlist, solicit, or induce his former employer's current agents, employees, and representatives to terminate or alter their employment. *See, e.g.*, *Diodato*, 44 F. Supp. 3d at 569 ("Provisions which temporarily limit a former employee's ability to solicit his former customers and coworkers have long been enforced by Pennsylvania courts."). Such a restriction protects Penn Mutual's legitimate business interest in retaining workers who are the source of its customers' good will. The restrictions at issue in this case prohibit only a narrow range of conduct involving the enlistment, solicitation, and inducement of former co-workers, rather than "competition" generally, and they do so for at most 18 months. Defendants have offered no reason to believe that such a temporary restriction on their ability to solicit their former coworkers will impede their ability earn a living in their chosen field. Indeed, the burden imposed by these restrictions appears to be substantially smaller than the burdens imposed by other post-employment restrictive covenants that courts have found to be enforceable under Pennsylvania law. *See, e.g.*, *Hayes v. Altman*, 424 Pa. 23, 225 A.2d 670 (1967) (enforcing three-year prohibition on plaintiff's ability to "be engaged in or concerned with any work or services pertaining to the practice of optometry" within a six-mile radius of former employer's office). The court therefore rejects Defendants' argument that the employee non-solicitation provisions at issue are facially overbroad.

b.    **Solicitation or servicing of Penn Mutual policyholders**

The restrictions in Section 16(b)(3)(a) of the MPCs and 14(b)(3)(a) of the FSMCs are potentially more problematic. These sections prohibit, for one year following the end of the

individual Defendants' employment with Penn Mutual, the "further solicitation or servicing of policyholders of Penn Mutual or any other insurance company in the Penn Mutual holding company system for the purpose of inducing or attempting to induce such policyholders to cancel, lapse or fail to renew policyholders' policy and/or contract with Penn Mutual." (MPC § 16(b)(3)(a); FSMC § 14(b)(3)(a).)

Defendants first suggest that these provisions are overbroad because they lack a geographic limitation and are not limited to customers with whom the individual Defendants had "material contact." (Ind. Defs.' Mot. 7.) But courts have found temporary restrictions on the solicitation of a former employer's customers to be enforceable under Pennsylvania law—even where the restriction is neither limited to a specific geographic area nor limited to a subset of customers with whom the employee had material contact during his or her employment. *See, e.g.*, *Bell Fuel Corp. v. Cattolico*, 375 Pa. Super. 238, 242, 254-55, 544 A.2d 450, 452, 458 (1988) (finding that "the actual geographic scope" of a restriction on soliciting "customers" of former employer was impliedly limited to "the territory in which [those customers] customers are located"); *Plate Fabrication & Machining, Inc. v. Beiler*, No. 05-2276, 2006 WL 14515, at *6-8 (E.D. Pa. Jan. 3, 2006) (applying Pennsylvania law and modifying restriction on solicitation of former employer's "customers and clients" that lacked geographic *or* temporal limitations to include one-year time limitation); *cf. Charles Schwab & Co., Inc. v. Karpiak*, No. 06-4010, 2007 WL 136743 (E.D. Pa. Jan 12, 2007) (applying Pennsylvania law and upholding 18-month restriction on solicitation of customers "whose identity [the employee] learned during [his] employment," despite absence of geographic limitation). This court concludes that the absence of geographic and material-contact limitations is not enough, on its own, to render temporary restrictions on customer solicitation overbroad under Pennsylvania law.

That said, the absence of such limitations is troubling in this case because the restrictions in all four individual Defendants' contracts apply not only to the "solicitation" of Penn Mutual and its affiliates' policyholders, but to the "servicing" of those policyholders as well. The

13

prohibition on "servicing" policyholders of Penn Mutual or its affiliates is vague, and potentially encompasses a broader range of competitive conduct than the prohibition on "solicitation." True, the restriction applies only to "servicing" those policyholders for a particular purpose—that is, "for the purpose of inducing or attempting to induce such policyholders to cancel, lapse or fail to renew policyholders' policy and/or contract with Penn Mutual." And it is theoretically possible to construe the phrase "servicing of policyholders" narrowly, so that it encompasses only actions such as altering the face amount of a policy or the identity of the policy's beneficiary. But it is unclear how someone who no longer works for Penn Mutual could "service" the company's customers in this way. The object being serviced in this construction, moreover, would seem to be the Penn Mutual *policy*, rather than the policy*holder*. A more natural reading of the prohibition on the "servicing of policyholders . . . for the purpose of inducing or attempting to induce such policyholders to cancel, lapse, or fail to renew" encompasses a broad range of competitive conduct. Indeed, virtually any kind of "service" to a Penn Mutual customer could be construed as being motivated by a desire to persuade that customer to do business with one's own company instead of Penn Mutual. This is the essence of "competition," and the contracts' restriction on "servicing" any customer of Penn Mutual or its affiliates is, in effect, a restriction on "competing" with Penn Mutual or any of its affiliates in any geographic location for a period of one year.

Plaintiff has not pointed to any case in which a court upheld, in the absence of a geographic or material-contact limitation, a post-employment restriction on an employee conducting any business, in any location, with any of his former employer's customers. The only case Penn Mutual cites that comes close is *Wachovia Securities, LLC v. Durham*, No. 06-cv-1894, 2006 U.S. Dist. LEXIS 69040 (M.D. Pa. Sept. 26, 2006). In that case, the court preliminarily enjoined a defendant from violating a one-year covenant not to "initiate *or have any contact or communication, of any kind whatsoever*, for the purpose of inviting, encouraging, or requesting any customer" of the Employee's former employer to "transact any business with" or

"open a new account with the Employee's new employer."  *Id.* at *3-4 (emphasis added).  In granting the preliminary injunction, however, the court did not even consider the question of whether the covenant was facially overbroad under Pennsylvania law.  *Id.* at *7-8.  The scope of the court's injunction, moreover, was narrower than the contractual language on which it was premised, and only barred the defendant from "*soliciting* any business from any client whom he served or whose name became known to him while in the employ of [the plaintiff-employer]."  *Id.* at *15-16 (emphasis added).

This court concludes that the restrictions on "servicing" are overbroad insofar as they purport to prohibit the servicing of a Penn Mutual policy*holder* rather than a Penn Mutual policy.  Because these restrictions are time-limited, however, they are not so gratuitously overbroad that they "indicate[] an intent to oppress the employee and/or to foster a monopoly."  *Sidco*, 465 Pa. at 599, 351 A.2d at 257.  Pennsylvania law therefore permits the court to exercise its equitable discretion and modify the covenant to excise the offending restriction alone.  *See Id.* at 255 n.8 (quoting *Barb-Lee Mobile Frame Co. v. Hoot*, 416 Pa. 222, 224, 206 A.2d 59, 60 (1965) ("The man who wildly claims that he owns all the cherry trees in the country cannot be denied protection of the orchard in his backyard.")).  The restriction on "servicing" in sections 16(b)(3)(a) of the MPCs and 14(b)(3)(a) of the FSMCs is unenforceable, but the remaining restrictions in those sections are valid.

### c.    Interference with Penn Mutual's customer relationships

Plaintiff also claims in its Second Amended Complaint that the individual Defendants are "interfering with Penn Mutual's relationship with its customers."  (Second Am. Compl. ¶ 43.) Each of the four individual Defendants agreed to refrain, for one year, from "interfering in any way during such one-year period with existing policies and policyholders of Penn Mutual or of any other insurance company in the Penn Mutual holding company system."  (Rotter MPC § 16(b)(3)(c); Corteen MPC § 16(b)(3)(c); Hartig FSMC § 14(b)(3)(c); Dabrowski FSMC §

14(b)(3)(c).) As with the other restrictive covenants discussed above, Defendants argue that the non-interference clauses are overbroad and thus unenforceable.

This court need not decide whether they are, in fact, overbroad, because Plaintiff's factual allegations implicate only the restrictions in sections 16(b)(3)(a)-(b) of the MPCs and sections 14(b)(3)(a) and 14(b)(4) of the FSMCs. Because the non-interference clauses apply only for one year, moreover, they are not so gratuitously overbroad as to poison the otherwise enforceable restrictions in the contracts. *Sidco*, 465 Pa. at 599, 351 A.2d at 257.

## II.    Tortious Interference

Penn Mutual claims that AUL tortiously interfered with Plaintiff's contractual rights by "intentionally and unjustifiably induc[ing]" each of the four individual Defendants to breach their contracts with Penn Mutual. (*Id.* at ¶ 42.). AUL argues that Penn Mutual has failed to adequately plead a claim for tortious interference. The elements of this claim under Illinois law[10] are "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages." *Voelker v. Porsche Cars North America, Inc.*, 353 F.3d 516, 527 (7th Cir. 2003) (quoting *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill. 2d 145, 545 N.E.2d 672, 676 (1989)).

---

[10]    The choice-of-law provision in each of the underlying contracts extends only to the "constru[ction] and enforce[ment]" of those contracts (*see* MPC § 20; FSMC § 17). It thus does not determine the law governing Plaintiff's claim for tortious interference. Neither party has raised the question of whether Pennsylvania or Illinois law governs this claim, but both cite only to Illinois cases when discussing it in their briefs. "If no party raises a choice of law issue to the district court, 'the federal court may simply apply the forum state's substantive law.'" *Selective Ins. Co. of South Carolina v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016) (quoting *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). *See also Johnson Controls, Inc. v. Exide Corp.*, 129 F. Supp. 2d 1137, 1146 n.16 (N.D. Ill. 2001) (Shadur, J.) ("Where as here the litigants in a diversity case fail to discuss choice-of-law issues, instead citing primarily to Illinois cases (even though the facts may involve some contacts with other states), the substantive law of the forum is presumed to provide the rules of decision.").

Plaintiff's allegations with regard to the second and third elements of tortious interference are indeed thin.  Plaintiff asserts that AUL "has knowledge of the Managing Partner Contracts and Functional Sales Manager's Contracts."  (Second Am. Compl. ¶ 49.)  As AUL points out, however, the relevant question is not whether AUL *now* has knowledge of the contracts, but rather whether AUL became aware of the contracts prior to the alleged interference.  *See Guice v. Sentinel Technologies, Inc.*, 294 Ill. App. 32d 97, 110, 689 N.E.2d 355, 364 (1st Dist. 1997) (finding an alleged tortfeasor's lack of knowledge at the time a contract was executed to be "irrelevant" for purposes of a claim for tortious interference with contract, because alleged tortfeasor knew of the contract at the time of the alleged interference).  Penn Mutual has not alleged any facts suggesting that AUL knew of the non-solicitation clauses in the individual Defendants' contracts with Penn Mutual at the time of the alleged interference.  Nor has Penn Mutual provided any details about what AUL did that amounts to "inducing" the individual Defendants to breach their contracts.

Penn Mutual argues in its Response Brief that the individual Defendants' own knowledge of their contracts can be imputed to AUL, because under Illinois law "[a]n agent's knowledge is imputed to his principal if the knowledge concerns a matter within the scope of an agent's authority and was acquired in the scope of his duties."  *Installation Servs. v. Elecs. Research, Inc.*, No. 04 C 6906, 2005 WL 3180129, at *3 (N.D. Ill. Nov. 23, 2005) (Kennelly, J.) (citing *Bryant v. Livigni*, 250 Ill. App. 3d 303, 308, 619 N.E.2d 550, 555 (5th Dist. 1993)).  But Penn Mutual has not pleaded any facts suggesting that the individual Defendants somehow learned of the non-solicitation clauses in their contracts with their *old* employer within the course and scope of their employment by their new one.

"Allegations that state 'legal conclusions' or '[t]hreadbare recitals of the elements of a cause of action' are not entitled to the assumption of truth."  *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 679).  Because Penn Mutual has

presented only conclusory allegations in support of its claim for tortious interference with contract, Defendants are entitled to judgment on the pleadings with regard to that claim.

## CONCLUSION

Defendants' motions for judgment on the pleadings [24, 27] are granted in part and denied in part. Defendants are entitled to judgment in their favor on Count II of Plaintiff's Second Amended Complaint, because Plaintiff has failed to adequately plead a claim of tortious interference with contractual relations. But Defendants are not entitled to judgment in their favor on Count I, because section 16(b)(3)(b) of the Managing Partner Contracts (MPCs) is enforceable under Pennsylvania law; section 14(b)(4) of the Functional Sales Manager Contracts (FSMCs) is enforceable insofar as it restricts the solicitation of persons who are agents or employees of Penn Mutual at the time of the solicitation; and sections 16(b)(3)(a) of the MPCs and 14(b)(3)(a) of the FSMCs are enforceable insofar as they restrict the "solicitation," rather than the "servicing," of Penn Mutual's and its affiliates' policyholders.

ENTER:

Dated: March 23, 2018

_____
REBECCA R. PALLMEYER
United States District Judge

18